IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

**CHARLESTON DIVISION**

LOGAN & KANAWHA COAL CO., LLC,

                Plaintiff,

v.                                   CIVIL ACTION NO.  2:11-cv-00342

DETHERAGE COAL SALES, LLC,

                Defendant.

**MEMORANDUM OPINION & ORDER**

Pending before the court are the plaintiff Logan & Kanawha Coal Co., LLC's ("Logan") Motion to Confirm Arbitration Award [Docket 1] and the defendant Detherage Coal Sales, LLC's ("Detherage") Motion to Vacate Arbitration Award [Docket 9].  For the reasons discussed below, the court **DENIES** the plaintiff's Motion to Confirm Arbitration Award [Docket 1] and **GRANTS** the defendant's Motion to Vacate Arbitration Award [Docket 9].

I.      **Background**

      A.    *Facts*

Around March 9, 2010, Steve Melton from Logan faxed a purchase order draft to Bill Detherage.  (Def.'s Mem. Supp. Mot. Vacate Arbitration Award & Opp'n Pl.'s Mot. Confirm Award [Docket 10], at 2.)  The fax included a cover sheet stating that the fax was two pages and the purchase order.  (*Id.*)  The purchase order offered to purchase from Detherage "10,000 tons per month of Alma Seam Coal."  (*Id.*)  Additionally, the purchase order contained the following

statement: "ALL TERMS & CONDITIONS ON THE FOLLOWING PAGES ARE INTO AND MADE A PART OF THIS CONTRACT."[1]  (*Id.*)  However, the fax did not contain any pages other than the cover sheet and the purchase order.  (*Id.*)

Mr. Detherage received the fax from Logan, changed the quantity term on the purchase order from "10,000 clean tons per month to 7,000," and signed and returned the purchase order to Logan.  (*Id.*)  On or around March 15, 2010, Mr. Melton at Logan signed the purchase order and faxed it back to Mr. Detherage.  (*Id.*)  On the fax's cover page was the statement "We have a deal."  The cover page states that the fax only consists of two pages, including the cover page.  (*Id.*)

On May 11, 2010, Logan sent Detherage a letter that stated "[p]lease find enclosed the written agreement setting forth the quantity, price, and other terms under which L&K demands performance."  (Resp. Mot. Vacate Arbitration Award [Docket 14], at 5.)  Included with the letter were the purchase order and the Logan & Kanawha Coal Co., LLC Standard Terms & Conditions, which contained an arbitration clause.  (*Id.*)  After receiving the letter from Logan, Detherage began delivering coal to Logan.  (*Id.*)

A dispute between the parties arose concerning Detherage's performance under the contract.  (*Id.* at 5-6; Def.'s Mem. Supp. Mot. Vacate & Opp. Pl.'s Mot. Confirm Award [Docket 10], at 2.)  Logan filed an arbitration demand on December 28, 2010, with the American Arbitration Association ("AAA") asserting that Detherage breached their agreement.  (Def.'s Mem. Support Mot. Vacate & Opp. Pl.'s Mot. Confirm Award [Docket 10], at 2.)  In response, Detherage's counsel sent a letter to Logan's counsel seeking documentation regarding whether

---

[1]      The court assumes that the statement intended to include the word "incorporated."

Detherage had received the standard terms and conditions as part of the parties' contract.  (*Id*. at 3.)

Subsequently, Detherage sent a letter to the AAA appointing an arbitrator.  Included in the letter was the following statement:  "Without consenting to arbitration and without waiving defenses and rights available to Detherage Coal Sales, LLC . . . [Detherage] does hereby designate the following individual as its arbitrator . . . ."  (*Id*.)  However, Detherage refused to pay the AAA's arbitration fee or participate in the arbitration panel's evidentiary hearing.  (*Id*. at 4.)  Ultimately, the arbitration panel concluded that under the Uniform Commercial Code ("UCC"), the parties had agreed to arbitrate the dispute and Logan was entitled to an award of $2,706,000.  (Resp. Mot. Vacate Arbitration Award [Docket 14-12], at Ex. L.)

B.      *Procedural History*

On May 13, 2011, Logan filed a Motion to Confirm Arbitration Award [Docket 1].  In response, Detherage filed a Motion to Vacate Arbitration Award [Docket 9] and a Response in Opposition to Plaintiff's Motion to Confirm Arbitration Award [Docket 10].  The Motions are now ripe for review.

II.      **Contract Formation and Agreement to Arbitrate Analysis**

A.      *Contract Formation*

The parties do not dispute that a valid contract was formed during their exchanges in March 2010.  *See* 1 PATRICIA F. FONSECA & JOHN R. FONSECA, WILLISTON ON SALES § 7:31 (5th ed. 2005) ("[T]he court needs only determine first whether or not a contract has been formed").  Under West Virginia Code § 46-2-204(1), "[a] contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the

existence of such a contract." W. VA. CODE § 46-2-204.  For a valid contract to be formed, the parties must intend to enter into and be bound by the agreement.  *See* 1 RICHARD A. LORD, WILLISTON ON CONTRACTS § 3:2 (4th ed. 2011).

In this case, the parties intended to be bound by their fax exchanges.  After receiving the purchase order from Logan, Mr. Detherage altered the quantity term, signed the purchase order, and returned it to Logan.  (Def.'s Mem. Supp. Mot. Vacate & Opp'n Pl.'s Mot. Confirm Award [Docket 10], at 2.)  Mr. Melton at Logan then signed the purchase order and returned it to Mr. Detherage.  On the cover page of this document was the statement "We have a deal."  (*Id.*)  After this exchange of documents, Detherage began to deliver coal to Logan.  (Resp. Mot. Vacate Arbitration Award [Docket 14], at 5.)  Thus, Logan and Detherage intended to be bound by their March 2010 agreement and a valid contract was formed.

B.    *Contractual Agreement to Arbitrate*

The court must next consider what terms are included in the parties' agreement.  *See* WILLISTON ON SALES § 7:31 ("If the contract has been formed, the court must then determine what terms are contained in the contract so that the court may enforce those terms.").  The parties dispute whether their March 2010 agreement includes an agreement to submit disputes to arbitration.  Logan asserts that the contract contains an arbitration provision, which would require that the parties arbitrate all disputes.  (Mem. Supp. Mot. Confirm Arbitration [Docket 2], at 2.)  Detherage argues that it "never agreed to arbitrate" and that it "objected to the arbitration." (Def.'s Mem. Supp. Mot. Vacate & Opp'n Pl.'s Mot. Confirm Award [Docket 10], at 1.) Detherage also claims that "[i]t is undisputed that the purchase order signed by the parties did not contain an agreement to arbitrate." (*Id.* at 2.)

- 4 -

The United States Supreme Court has found that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (quoting *Steelworkers v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960)). Even though courts view arbitration agreements favorably, an "underlying agreement between the parties to arbitrate" must exist. *Arrants v. Buck*, 130 F.3d 636, 640 (4th Cir. 1997). Arbitration agreements are required because "arbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration." *AT&T Techs., Inc. v. Communc'ns Workers of Am.*, 475 U.S. 643, 648-49 (1986). Otherwise, a party will be deprived of its right to have a court decide the "merits of its dispute." *See First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 942 (1995) ("[A] party who has not agreed to arbitrate will normally have a right to a court's decision about the merits of its dispute (say, as here, its obligation under a contract).").

Determining whether the parties agreed to arbitrate is usually an issue for judicial determination. *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 130 S. Ct. 2847, 2855 (2010); *Howsam*, 537 U.S. at 83. "Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." *AT&T Techs.*, 475 U.S. at 649; *Peabody Holding Co., LLC v. United Mine Workers of Am.*, No. 10-2134, -- F.3d --, 2012 WL 76054, at *8-9 (4th Cir. Jan. 11, 2012). Additionally, it is "well settled" that courts generally decide issues involving contract formation. *Granite Rock*, 130 S. Ct. at 2855-56; *see also Peabody Holding Co.*, 2012 WL 76054, at *13. A court determines the existence of an agreement by the parties to arbitrate "according to common law principles of contract law." *Arrants*, 130 F.3d at 640. Courts must apply state contract law

principles when determining whether a valid arbitration agreement exists. *First Options*, 514 U.S. at 944. In West Virginia, courts have acknowledged that a party can waive its "constitutionally-enshrined and fundamental rights to assert one's claims for justice before a jury in the public court system." *Brown v. Genesis Healthcare Corp.*, -- S.E.2d --, 2011 WL 2611327 (W. Va. 2011). "However, 'Courts indulge every reasonable presumption against waiver of a fundamental constitutional right and will not presume acquiescence in the loss of such fundamental right.'" *Id.* (quoting *State ex rel. May v. Boles*, 149 W. Va. 155 (1964)).

       1.    *Incorporation by Reference*

Logan first argues that the terms and conditions containing the arbitration clause were incorporated into the contract by reference. (Resp. Mot. Vacate Arbitration Award [Docket 14], at 9-10.) Specifically, Logan asserts that the language in the March 2010 agreement clearly referenced and incorporated the terms and conditions that contained an arbitration clause because the March 2010 agreement stated: "ALL TERMS & CONDITIONS ON THE FOLLOWING PAGES ARE INTO AND MADE PART OF THIS CONTRACT." (*Id.* at 4, 9-10.) Logan claims that Detherage received its standard terms and conditions, including the arbitration clause at issue in this case, at least four times before the March 2010 agreement from prior deals. (*Id.* at 2.) Additionally, Logan argues that Detherage received a copy of the terms and conditions after the March 2010 agreement and before Detherage delivered coal to Logan. (*Id.*)

In contrast, Detherage argues that "it did not agree to arbitration when it signed the purchase order." (Def.'s Mem. Supp. Mot. Vacate Arbitration Award & Opp'n Pl.'s Mot. Confirm Award [Docket 10], at 5.) It claims that there is no evidence that anyone from Detherage "ever actually agreed to—or even saw—the arbitration clause before or at the time the

contract was formed." (Reply Mem. Supp. Mot. Vacate Arbitration Award [Docket 16], at 6.) Additionally, Detherage asserts that the March 2010 agreement did not clearly reference the document Logan seeks to incorporate. (*Id.* at 8.)

The doctrine of incorporation by reference allows a document or provision to be read into an agreement. 11 RICHARD A. LORD, WILLISTON ON CONTRACTS § 30:25 (4th ed. 2011). For the writing to be incorporated into an agreement, the contract must "make[] clear reference to the document" and "describe[] it in such terms that its identity may be ascertained beyond doubt." *Id*. Additionally, "it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms . . . ." *Id.* The document must be identified beyond doubt so that the parties' intent to have the document read into the agreement can be clearly identified. *Id*. However, the doctrine does not require that the party "actually receive the terms to be incorporated," especially when "both parties are sophisticated business entities." *Power Paragon v. Precision Tech. USA, Inc.*, No. 7:08-CV-00542, 2009 WL 1856546, at *2 (W.D. Va. June 26, 2009).

In this case, Logan's terms and conditions, which include an arbitration clause, were not incorporated by reference into the March 2010 agreement. As explained above, a central requirement of the doctrine of incorporation by reference is that the document to be read into the agreement must be "clear[ly] referenc[ed]" and identified "in such terms that its identity may be ascertained beyond doubt." WILLISTON ON CONTRACTS § 30:25. Logan has two different terms and conditions documents. (Reply Mem. Supp. Mot. Vacate Arbitration Award [Docket 16], at 10.) Specifically, Logan has a "Logan & Kanawha Coal Co., LLC Standard Terms & Conditions," which was included in the May 11, 2010 letter from Logan to Detherage. (*Id.*)

Logan also has a "Logan and Kanawha Coal Co., LLC General Terms & Conditions," which Detherage received on a separate occasion. (*Id*.) The statement within the purchase order that Logan asserts incorporates the arbitration clause does not clearly reference either the general or the standard terms and conditions; the statement only references "ALL TERMS & CONDITIONS." Because the statement does not distinguish between Logan's general and standard terms and conditions, it is not clear which document the statement seeks to incorporate. The statement may refer to entirely different terms and conditions. Thus, the March 2010 agreement does not contain a "clear reference" to the terms and conditions such that it may be "ascertained beyond doubt" that it references the Logan & Kanawha Coal Co., LLC Standard Terms & Conditions. Accordingly, the court **FINDS** that the parties' March 2010 agreement does not incorporate by reference Logan's standard terms and conditions.[2]

2. *W. Va. Code § 46-2-207: Additional Terms in Acceptance or Confirmation*

Logan also argues that the standard terms and conditions became part of the contract under West Virginia Code § 46-2-207, which is the West Virginia battle of the forms provision. Logan asserts that its May 11, 2010 letter to Detherage, which included a copy of Logan's standard terms and conditions, was a written confirmation of the March 2010 agreement. (Resp. Mot. Vacate Arbitration Award [Docket 14], at 12-13.) Logan also asserts that Detherage did not object to the written confirmation, and began delivering the coal. (*Id*.) Thus, according to

---

[2]   Detherage received from Logan both terms and conditions. The two terms and conditions are "materially different" from each other. (Reply Mem. Supp. Mot. Vacate Arbitration Award [Docket 16], at 10.) However, the defendant acknowledges that the two terms and conditions are not materially different "as to the arbitration terms." (*Id*.)

Logan, the terms included in the written confirmation became part of the parties' agreement under § 46-2-207.

In contrast, Detherage argues that the May 11, 2010 letter did not become part of the contract under § 46-2-207.   Detherage asserts that the letter was not an "acceptance or confirmation" because the "acceptance of the contract terms" took place when Logan "signed the one-page contract and returned it."  (Reply Mem. Supp. Mot. Vacate Arbitration Award [Docket 16], at 11.)  Detherage maintains that "Section 2-207 cannot be stretched to mean that a contract signed by both parties can be modified by a letter, written two months later, because the letter (not the contract) contained terms which were not objected to."  (*Id.* at 10.)

UCC § 2-207 is an area of the law characterized by chaos and judicial confusion.[3]  This confusion is exacerbated by the scarcity of guidance from West Virginia courts on this subject matter.  West Virginia codified UCC § 2-207 in West Virginia Code § 46-2-207.  West Virginia Code § 46-2-207 provides in pertinent part that:

> (1)  A definite and seasonable expression of acceptance or a written confirmation which  is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.
> (2)  The additional terms are to be construed as proposals for addition to the contract.  Between merchants such terms become part of the contract unless:
> > (a)  The offer expressly limits acceptance to the terms of the offer;

---

[3]     One court described UCC § 2-207 stating:

> [T]he writers of § 2-207 sought to correct the common law inadequacies.  Unfortunately, the section resulting from so noble a purpose is uniformly misunderstood and criticized for its obscurity.  Referred to as a "murky bit of prose," and "like the amphibious tank that was originally designed to fight in the swamps, but was ultimately sent to fight in the desert," § 2-207 is a defiant, lurking demon patiently waiting to condemn its interpreters to the depths of despair.

*Reaction Molding Tech., Inc. v. Gen. Elec. Co.*, 585 F. Supp. 1097, 1104 (E.D. Pa. 1984).

(b)  they materially alter it; or
(c)  notification of objection to them has already been given or is
given within a reasonable time after notice of them is received.

W. Va. Code § 46-2-207(1)-(2).

The comments accompanying § 46-2-207 explain that § 46-2-207 applies in two situations. First, it applies during offer and acceptance when the writing that is intended as the acceptance contains terms that are not contained in the original offer. W. Va. Code § 46-2-207 cmt. 1. Second, it applies when the parties have reached either an oral or informal agreement, and they send written confirmations of the agreement that contain additional terms not found in the original agreement. *Id.*

In this case, the May 11, 2010 letter was not an acceptance that contained additional terms because the contract between the parties was formed by the March 2010 exchanges. Consequently, the first scenario is inapplicable. The court must also consider whether the May 11, 2010 letter was a written confirmation sent within a reasonable time, and thus falls within the second scenario contemplated by § 46-2-207. Section 46-2-207 applies to a written confirmation that follows an oral or informal agreement. Specifically, the § 46-2-207 comments state that the section applies to a written confirmation "where an agreement has been reached either orally or by informal correspondence between the parties and is followed by one or both of the parties sending formal memoranda embodying the terms so far agreed upon and adding terms not discussed." W. Va. Code § 46-2-207 cmt. 1.

Generally, courts' evaluations of whether a writing is a written confirmation involve scenarios in which a writing is sent after an oral agreement. In contrast, the May 11, 2010 letter is a writing sent after a written agreement. I find no instance in which a West Virginia court has

- 10 -

confronted the issue before this court:  whether a writing sent after a written contract qualifies as a written confirmation under § 46-2-207.

Much of the confusion surrounding the second scenario in which § 2-207(1) applies stems from the statutory language that states:  "a written confirmation which is sent within a reasonable time operates as an acceptance."   W. VA. CODE § 46-2-207(1).   Courts and commentators have questioned how a written confirmation could act as an acceptance if a valid contract between the parties has already been formed.  *See, e.g.*, *Reaction Molding Tech., Inc. v. Gen. Elec. Co.*, 585 F. Supp. 1097, 1104 (E.D. Pa. 1984) (stating that this application of § 2-207 "appears illogical because if an oral agreement has already been reached, there should be no need for an 'acceptance'"); *see also* 1 JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 1-3, at 74-76 (5th ed. 2011).

Courts have attempted to reconcile the "acceptance" language contained in § 2-207 with the existence of a prior contract by reading § 2-207 along with UCC § 2-201, the UCC's Statute of Frauds provision.  Specifically, some courts have found that a writing qualifies as a written confirmation if it embodies the terms of the parties' agreement such that the Statute of Frauds no longer bars enforcement of the agreement.  *Echo, Inc. v. Whitson Co., Inc.*, 121 F.3d 1099, 1104 (7th Cir. 1997) ("Section 2-207(1) therefore allows a written confirmation to turn an oral or informal agreement into a legally-binding contract based on the terms already agreed upon . . . .").  "The written confirmation is recognized primarily as a writing necessary to satisfy the statute of frauds when the agreement reached is at least partially unenforceable for lack of a writing; this appears to be the primary basis for permitting a written confirmation to act as an acceptance under [§ 2-207]."  *Mid-South Packers, Inc. v. Shoney's, Inc.*, 761 F.2d 1117, 1123

(5th Cir. 1985); *see, e.g.*, *Rocheux Int'l of N.J. v. U.S. Merch. Fin. Grp., Inc.*, 741 F. Supp. 2d 651, 679-80 (D.N.J. 2010).   One court reasoned that "the primary purpose of the written confirmation rule is to allow parties to enforce contracts that would be unenforceable due to the statute of frauds."   *Reaction Molding*, 585 F. Supp. at 1105.   Thus, a writing qualifies as a written confirmation when it makes a contract to which the Statute of Frauds applies enforceable. *See Echo*, 121 F.3d at 1103-04 ("What the UCC must mean [in § 2-207] is that the confirmation makes the agreement legally enforceable.").

This reasoning relies on the statutory language of the UCC.   Section 46-2-207 and § 46-2-201 are the only sections in the UCC that reference a "written confirmation."   1 PATRICIA F. FONSECA & JOHN R. FONSECA, WILLISTON ON SALES § 7:33 (5th ed. 2005).   Additionally, § 46-2-207 states that a written confirmation "operates as an acceptance."   W. VA. CODE § 46-2-207(1). As previously discussed, this language does not make sense at first blush because it appears "illogical" that a written confirmation can act as an acceptance after the parties have formed a valid contract.   *Echo*, 121 F.3d at 1103-04; *see, e.g.*, *Reaction Molding*, 585 F. Supp. at 1104-05; *Rocheux International*, 741 F. Supp. 2d at 678-79.   However, when a writing makes a contract enforceable under the Statute of Frauds, it acts as an acceptance because the writing transforms a contract that was unenforceable under the Statute of Frauds into an enforceable contract.   *Echo*, 121 F.3d at 1104.

Reading § 2-207 in light of § 2-201 provides a standard to determine whether a writing sent after a valid contract has been formed qualifies as a written confirmation for purposes of § 2-207. *Mid-South Packers*, 761 F.2d at 1123 ("[W]here contract is within statute of frauds, §§ 2-201(2) and 2-207(1) are to be read together in determining whether writing is

'confirmation.'") (citing 1 A. SQUILLANTE & J. FONESCA, WILLISTON ON SALES § 7:5 at 284-87). Courts have emphasized that not all written communications after an agreement are written confirmations. *See Preston Farm & Ranch Supply, Inc. v. Bio-Zyme Enters.*, 625 S.W.2d 295, 299 (Tex. 1981); *see also* WILLISTON ON SALES § 7:33, at 376-77. Standards must exist to determine what qualifies as a written confirmation or merchants could repeatedly alter an already-existing contract by sending each other writings containing additional terms. One court reasoned that UCC § 2-207 "does not contemplate multiple written confirmations operating as acceptance, with each confirmation having the capability of adding new and/or different terms." *Rocheux International*, 741 F. Supp. 2d at 679.

Considering UCC § 2-207 alongside UCC § 2-201 provides a clear line for determining whether a writing is a written confirmation of a contract that falls under the Statute of Frauds. When a writing that satisfies the Statute of Frauds is sent after an oral or written contract and makes the contract enforceable under the Statute of Frauds, the writing operates as an acceptance because the Statute of Frauds previously barred enforcement of the contract. That writing is a written confirmation. However, a writing sent after the contract is enforceable under the Statute of Frauds does not operate as an acceptance. An enforceable contract between the parties already exists, and thus the subsequent writing is not a written confirmation because it does not satisfy the statutory language of § 46-2-207(1). *See* W. VA. CODE § 46-2-207(1) ("[A] written confirmation . . . *operates* as an acceptance . . . .") (emphasis added).

Based on this reasoning, I predict that the West Virginia Supreme Court of Appeals would hold that a written confirmation under § 46-2-207 is one that makes the parties' agreement enforceable under the Statute of Frauds. Similarly, I believe that the West Virginia Supreme

Court of Appeals would find that a writing sent by a party after the contract is already
enforceable under the Statute of Frauds does not qualify as a written confirmation under § 46-2-
207 because it does not "operate[] as an acceptance" by making the contract enforceable.
Accordingly, this court **FINDS** that a writing sent after a contract satisfies the Statute of Frauds
is not a written confirmation under § 46-2-207.

In this case, the parties' March 2010 agreement involved writings sufficient to satisfy the
Statute of Frauds.  The Statute of Frauds requires:

> (1)  Except as otherwise provided in this section a contract for the sale of goods
> for the price of $500 or more is not enforceable by way of action or defense
> unless there is some writing sufficient to indicate that a contract for sale has been
> made between the parties and signed by the party against whom enforcement is
> sought or by his authorized agent or broker. . . .
>
> (2)  Between merchants if within a reasonable time a writing in confirmation of
> the contract and sufficient against the sender is received and the party receiving it
> has reason to know its contents, it satisfies the requirements of subsection (1)
> against such a party unless written notice of the objection to its contents is given
> within ten days after it is received.

W. VA. CODE § 46-2-201(1)-(2).    Logan signed the purchase order that it received from
Detherage on or around March 15, 2010.  The purchase order indicated that the parties had
entered a contract, and the purchase order satisfied the Statute of Frauds.  Thus, the May 11,
2010 letter is not written confirmation under § 46-2-207 because the parties' contract was
already enforceable under the Statute of Frauds.  A writing that contains additional or different
terms only falls within § 46-2-207 if it is a "definite and seasonable expression of acceptance" or
if the writing is a "written confirmation which . . . operates as an acceptance" because the Statute

- 14 -

of Frauds no longer bars enforcement of the parties' agreement.[4]  *See* W. VA. CODE § 46-2-207(1).  Because the May 11, 2010 letter is not a written confirmation or an acceptance containing terms in addition to or different from the original agreement, the court **FINDS** that § 46-2-207 does not apply to the May 11, 2010 letter.  Accordingly, the court **FINDS** that the arbitration provision did not become part of the parties' March 2010 agreement under § 46-2-207.

3.      *Contract Modification Under W. Va. § Code 46-2-209*

Logan also argues that its May 11, 2010 letter constituted a contract modification proposal, which Detherage accepted through its silence and by beginning performance under the contract.  (Resp. Mot. Vacate Arbitration Award [Docket 14], at 15.)  Specifically, Logan asserts that the May 11, 2010 letter proposed additional contract terms, and Detherage accepted the additional terms because it manifested assent through silence and by beginning performance.  *Id*.  Thus, according to Logan, Detherage's silence and delivery of coal after receipt of the May 11, 2010 letter constituted its acceptance of the additional terms, and the arbitration provision became part of the agreement.  *Id*. at 18.

West Virginia Code § 46-2-209 is the UCC provision governing contract modification.  Section 2-209 applies once the contract is formed, and it establishes the requirements for a valid contract modification.[5]  *See Ariz. Retail Sys. v. Software Link, Inc.*, 831 F. Supp. 759, 763 (D. Ariz. 1993).  Section 46-2-209 provides in pertinent part that:

---

[4]      Instead, any proposal for additional terms between the parties must be evaluated under West Virginia Code § 46-2-209 because a valid, enforceable agreement already existed between the parties.  *See Rocheux International*, 741 F. Supp. 2d at 679.  Section 2-209 governs the modification of contracts under the UCC.  *See id.*

[5]      Logan's argument does not specifically reference UCC § 2-209 or explicitly argue that it was a contract modification.  However, Logan argues that the terms contained in the May 11, 2010 letter were accepted by Detherage's silence, failure to provide assurances, and subsequent performance even if the terms were not

- 15 -

(1)  An agreement modifying a contract within this article needs no consideration to be binding. . . .

(3)  The requirements of the statute of frauds section of this article (section 2-201) [§ 46-2-201] must be satisfied if the contract as modified is within its provisions.

W. VA. CODE § 46-2-209(1), (3).

A valid contract modification under § 46-2-209 requires that the parties agree to modify the contract.  *See* 2A LARY LAWRENCE, LAWRENCE'S ANDERSON ON THE UNIFORM COMMERCIAL CODE § 2-2-209:23 (3d ed. 2008).  One party cannot modify the contract without the other party's consent.  *See id*. ("Mutual assent is required to establish the existence of a modification of the sales contract."); *see also Wyatt Coal Co. v. Detroit Edison Co.*, 8 F.2d 215, 216 (4th Cir. 1925).  Mutual assent requires a "meeting of the minds" between the two parties and may be evidenced by "word, act or conduct which evince the intention of the parties to contract."  4A MICHIE'S JURISPRUDENCE OF VIRGINIA AND WEST VIRGINIA, CONTRACTS § 26 (1999).  Some courts have found that silence by one party can indicate assent and have held that a valid contract existed when the silence of one party constituted acceptance of the proposal.  *See*  1 JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE, § 1-7, at 108 (5th ed. 2011) (citing *Gateway Co., Inc. v. Charlotte Theatres, Inc.*, 297 F.2d 483, 486 (1st Cir. 1961)).

In West Virginia, silence plus the offeree beginning performance can constitute acceptance.  *See First Nat'l Bank of Gallipolis v. Marietta Mfg. Co.*, 151 W. Va. 636, 641-42 (1967) ("That an acceptance may be effected by silence accompanied by an act of the offeree

_____

previously part of the agreement between the parties.  (Resp. Mot. Vacate Arbitration Award [Docket 14], at 17-18 ("Even if those Terms & Conditions were not previously a part of the Agreement, they became so as a result of Detherage's inaction and silence."); *see also id*. at 15 ("The conclusion that Detherage's silence and subsequent partial performance after receiving the Terms & Conditions operated as an acceptance of those Terms . . . .")).  Essentially, Logan argues that the May 11, 2010 letter was a contract modification proposal that would alter the

which constitutes a performance of that requested by the offeror is well established."). However, silence alone is usually insufficient to establish consent to an agreement. *See Quincy Dairy Co. v. Hartford Accident & Indem. Co.*, 57 F. Supp. 899, 903 (S.D. W. Va. 1944) ("Mere silence on the part of an offeree, or his failure to accept the offer promptly can never be construed as an acceptance, unless there is some duty resting on the offeree to reply or accept.").

Acceptance through silence accompanied by beginning performance under the contract raises additional concerns in the context of contract modification. When a party proposes to modify a contract, by definition, a contract between the parties already exists and the offeree is obligated to perform under the existing agreement. Thus, it is difficult to discern whether the offeree's performance is conduct manifesting assent to the proposed modification or if the performance is simply the offeree fulfilling its preexisting duty under the contract. Doubt exists as to whether performance constitutes acceptance when there is a contract modification proposal under UCC § 2-209, and the offeree is silent as to the proposed modification and later performs under the contract, but the party's performance was already required under the original contract.

Some courts have responded to such concerns by requiring that offerees expressly assent to contract modification proposals and that assent "cannot be inferred merely from a party's conduct in continuing with the agreement." *Ariz. Retail Sys.*, 831 F. Supp. at 764; *see, e.g.*, *U.S. Surgical Corp. v. Orris, Inc.*, 5 F. Supp. 2d 1201, 1206 (D. Kan. 1998); *Klocek v. Gateway, Inc.*, 104 F. Supp. 2d 1332, 1341 (D. Kan. 2000); *TRA Indus. v. Valspar Corp.*, No. CV-10-026-JLQ, 2010 WL 2854251, at *4 (E.D. Wash. July 19, 2010). The courts' holdings relied on the reasoning found in *Step-Saver Data Systems, Inc. v. Wyse Technology*, an opinion by the Court

---

terms of the parties' previous agreement. Section 2-209 is the UCC provision addressing contract modification, and

of Appeals for the Third Circuit.  939 F.2d 91 (3d Cir. 1991).  *Step-Saver* involved the question

of whether a "Limited Use License Agreement" included on the packaging of a software

program was part of a software contract under UCC § 2-207.  *Id.* at 93.  The Third Circuit stated

that:

> [P]roceeding with a contract after receiving a writing that purports to define the terms of the parties's contract is not sufficient to establish the party's consent to the terms of the writing to the extent that the terms of the writing either add to, or differ from, the terms detailed in the parties's earlier writings or discussions.

*Id*. at 99.  The Third Circuit reasoned that a party must expressly consent to additional terms, and

its consent cannot be inferred by the offeree fulfilling its already-existing obligation.  Although

*Step-Saver* involved questions of assent and performance under UCC § 2-207, courts have

applied its reasoning when evaluating assent to a contract modification under UCC § 2-209.  *See,*

*e.g.*, *U.S. Surgical Corp.*, 5 F. Supp. 2d at 1206 ("The express assent analysis is the same under

§§ 2-207 and 2-209.").

      This court finds the reasoning of *Step-Saver* and its application to UCC § 2-209

convincing.  This court also believes that the West Virginia Supreme Court of Appeals would be

persuaded by such reasoning.  Therefore, I conclude that an offeree's silence and continuation of

its course of performance is insufficient to demonstrate assent to the proposed modification.

Specifically, an offeree must expressly consent to a contract modification under § 46-2-209 when

it is already obligated to perform, and continuing the course of performance is not express

consent.   This principle is consistent with the court's understanding of the general principle of

contract law that there must be a "meeting of the minds" for a contract to be formed.  *See* 4A

MICHIE'S JURISPRUDENCE OF VIRGINIA AND WEST VIRGINIA, CONTRACTS § 26 (1999).  The court

---

thus this court's analysis is governed by § 2-209.

cannot determine if there was a meeting of the minds regarding a contract modification proposal if the offeree merely acts in accordance with its preexisting obligations.

In this case, Detherage did not respond to Logan's May 11, 2010 letter, but it began performing under the parties' agreement approximately one month later. However, Detherage was already obligated to deliver the coal under the parties' March 2010 agreement. Detherage's delivery of the coal does not manifest assent to the contract modification proposals in the May 10, 2010 letter because Detherage was acting consistently with its preexisting obligations. Based on this reasoning, I **FIND** that Detherage did not accept Logan's contract modification proposals contained in the May 11, 2010 letter. Accordingly, the court **FINDS** the parties did not form a modified contract that contained the arbitration provision.[6]

## III. Conclusion

The court **FINDS** that the arbitration provision was not part of the agreement between Logan and Detherage, and no "underlying agreement between the parties to arbitrate" existed. *See Arrants v. Buck*, 130 F.3d 636, 640 (4th Cir. 1997). Because Detherage did not agree to arbitrate the dispute, the court also **FINDS** that Detherage was not required to submit the dispute to arbitration. Accordingly, the defendant's Motion to Vacate Arbitration Award [Docket 9] is **GRANTED** and the plaintiff's Motion to Confirm Arbitration Award [Docket 1] is **DENIED**.

---

[6] Because the court finds that there was no agreement between the parties to arbitrate any dispute, including the question of arbitrability, the court does not "give considerable leeway to the arbitrator['s decision]" on the arbitrability of this dispute and reviews the arbitrator's decision independently. *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995); *see AT&T Techs., Inc. v. Communc'ns Workers of Am.*, 475 U.S. 643, 649 (1986) ("Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator."); *Peabody Holding Co., LLC v. United Mine Workers of Am.*, No. 10-2134, -- F.3d --, 2012 WL 76054, at *13 (4th Cir. Jan. 11, 2012) ("[W]here a contract commits to arbitration those matters 'arising under' the agreement, we may not submit questions of contract formation to the arbitrator, as those questions cannot 'arise under' an agreement that was never validly formed.").

The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.   The court **DIRECTS** the Clerk to post a copy of this published opinion on the court's website, www.wvsd.uscourts.gov.

ENTER:          January 20, 2012

Joseph R. Goodwin, Chief Judge